**Opinion issued April 20, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-19-00583-CR**

———————————

**CHRISTOPHER JAKE JEANSONNE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case No. 1537931**

---

# O P I N I O N

A jury found appellant, Christopher Jake Jeansonne, guilty of the felony offense of sexual assault of a child.[1] After finding true the allegation in an enhancement paragraph that appellant had been previously convicted of a felony

---

[1] *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(A), (c), (f).

offense, the trial court assessed his punishment at confinement for life.[2] In three issues, appellant contends that the evidence is insufficient to support his conviction and the trial court erred in admitting certain evidence.

We affirm.

## Background

The complainant testified that in October 2016, she was fifteen years old and in the tenth grade at school. Her best friend was A.K., and they did "[e]verything" together. The complainant and A.K. were the same age.

Prior to October 2016, the complainant and A.K. were also friends with M.L., and the three girls regularly "hung out." M.L. was a year older than the complainant, but they were in the same grade at school. When the complainant, A.K., and M.L. hung out together, they did so at either A.K.'s house or M.L.'s house because those two girls lived in the same neighborhood and only a couple of streets apart from each other. The complainant noted that there were times during her friendship with M.L. when they did not get along.[3]

The complainant further testified that appellant is M.L.'s uncle, and the complainant first met appellant when she was thirteen or fourteen years old. When the complainant, A.K., and M.L. spent time at M.L's house, appellant would also

---

[2] *See id.* § 12.42(c)(2).

[3] The complainant stated that she and M.L. stopped being friends before the fall of 2016 and she had not been friends with M.L. "for months" before October 2016.

2

be there.  Most of the time M.L.'s mother was not at M.L.'s house when the girls were there, and appellant would look after the complainant, A.K., and M.L.; he would spend time with them.  The complainant described her relationship with appellant as "a family friend" because he would "watch[] over" the girls and he was related to M.L.'s mother.  Appellant acted more like the girls' friend than an adult, and appellant would participate in the girls' conversations.

According to the complainant, on or about October 1, 2016, the complainant attended a party at A.K.'s house to celebrate A.K.'s grandparents' birthdays or anniversary.  The complainant and A.K. were not friends with M.L. at the time, and the complainant did not see M.L. on the day of the party.  The party at A.K.'s house started in the evening, and the people who attended the party were either A.K.'s family members or family friends.  The complainant and A.K. drank alcohol—a "mixed drink" in a cup—at the party, and the complainant drank "two glasses at most"; "[i]t wasn't much."

At some point, about "[m]id-party," appellant showed up at A.K.'s house with a dog.  Appellant was not invited to the party.  When appellant arrived at A.K.'s house, there were still a lot of people at the party.  The complainant was near the front door of the house with A.K., and they answered the door when appellant arrived.  Appellant was at A.K.'s house with the dog for about ten minutes, and then the complainant and A.K. walked with appellant to M.L.'s house

3

so that appellant could drop off the dog because he wanted to come back to the party. Only appellant, the complainant, and A.K. walked to M.L.'s house, and they talked on the way like they were friends. At M.L.'s house, appellant took the dog inside, and the complainant and A.K. waited outside. After appellant came back out of the house, the three walked back to A.K.'s house.

When they returned to A.K.'s house, there were fewer people there, but A.K.'s mother and father and A.K.'s uncle, Matt,[4] were still there and awake. But eventually, only the complainant, A.K., appellant, and Matt remained awake. Around midnight, the four of them were in the backyard of A.K.'s house near the fire pit. The complainant and A.K. were singing and dancing in the backyard, and appellant and Matt were talking. Everyone was happy.

At some point, appellant went inside A.K.'s house. After appellant went inside, the complainant went inside because she was hungry. A.K. and Matt stayed outside. While inside the house, the complainant saw appellant go to the bathroom near the kitchen. The complainant heard "something," like a noise, coming from the bathroom. The light to the bathroom was not on, and appellant peeked his head out and told the complainant to "come here." The complainant went to the door of the bathroom, and appellant grabbed her hand and pulled her inside the bathroom. Appellant closed the bathroom door. Appellant pulled down the complainant's

---

[4] "Matt" is A.K.'s uncle's nickname.

spandex bottoms and underwear and started kissing the complainant on her lips. While in the bathroom the complainant said either "[s]top" or "they're going to know." Appellant replied, "[S]hh, they're not going to know."

Appellant and the complainant moved in front of the sink, with the complainant facing the sink. Appellant was behind her. Appellant then penetrated the complainant's vagina with his penis. The complainant "froze." She said nothing. Appellant told the complainant, "I've been waiting so long to fuck you." Appellant stopped penetrating the complainant's vagina and ejaculated into the toilet. When the sexual assault was over and appellant turned the bathroom light on, the complainant saw appellant's semen inside the toilet.

Appellant told the complainant to "stay [in the bathroom] while he [went] out first." Appellant closed the bathroom door behind him when he left. The complainant remained in the bathroom for a couple of minutes, kneeling down behind the door "trying to figure out what . . . to do[] [and] what had happened." The complainant assumed that appellant went out to the backyard because when she exited the bathroom, he came back into the house. Appellant asked if she was "okay." The complainant said that she felt "like [she was] going to throw up," to which appellant responded, "[A]re we not talking about it[?]"

The complainant could not recall what happened right after her exchange with appellant, but then appellant started making the complainant an egg sandwich

5

in the kitchen. At some point, A.K. and Matt also came into the kitchen. The complainant sat near where appellant was cooking, although she did not think that she was acting normal. To the extent that she appeared "normal" to anyone else, the complainant explained that she behaved the way she did after the sexual assault because she "didn't want to make it obvious to everyone" what had just happened as she was scared and she "didn't do anything to stop" the sexual assault.

After eating, the complainant and A.K. started to go upstairs to get ready for bed. At the time, appellant was in the bathroom again, and the complainant saw him "looking out the bathroom" at her and "trying to get [her] to go back to the bathroom." The complainant went upstairs.

While upstairs, A.K. noticed that the complainant was "acting different[ly]," and the complainant told A.K. that she was not going to go to sleep until appellant left the house. The complainant asked A.K. if she would have Matt tell appellant to leave. After appellant left the house, Matt came upstairs to talk to the complainant. Matt asked the complainant "[D]id [appellant] do what I think he did," and the complainant responded, "[Y]es." Matt became upset and ran outside.

Later that night, the complainant told A.K.'s mother, Laura, about what had happened. When speaking with Laura, the complainant was emotional. The complainant asked Laura not to call law enforcement officers. But the next day, law enforcement officers came to A.K.'s house, and the complainant went to the

6

hospital where she had a sexual assault examination. The complainant noted that in between the time she was sexually assaulted and the time she was examined at the hospital, she had used the restroom, peed, and used toilet paper to wipe her vaginal area.

The complainant also testified that appellant had done things that made her feel uncomfortable in the past. He would "say certain things" and give her "certain looks." For instance, the day before the party at A.K.'s house, appellant needed a ride, and he asked Laura to drive him somewhere. A.K. and the complainant cleaned out the car, and then they both got in the backseat of the car. Because the complainant sat in the backseat behind the front seat where appellant sat, she said, "[M]y legs are up if you want to come back"—meaning that appellant "could scoot the seat back as far as he needed because he[] [was] sitting in the [front] passenger seat in front of [her]." In response, appellant gave the complainant a "look," like a "smirk," and the complainant believed that appellant was making some sort of "dirty joke."[5] Laura, A.K.'s mother, was not in the car at the time.

Additionally, the complainant noted that appellant had hugged her in the past, and he had touched her in a way on a "few" occasions that made her feel uncomfortable. One time, appellant gave the complainant a hug and the way he took his hand away after the hug was "like a rub." It was not a "normal hug." In

---

[5] A.K. recalled this car incident in her testimony and noted that appellant "smirked" in response to the complainant's statement and that "it was just weird."

the past, the complainant told both A.K. and M.L. that appellant had made her feel uncomfortable.

Finally, when asked at trial, "[D]o you see the person in th[e] courtroom [who] penetrated your vagina with his penis in the bathroom [at] . . . the beginning of October 2016," the complainant identified appellant. The complainant stated that she did not lie about the sexual assault to "get back at" M.L.[6]

A.K. testified that the complainant was her best friend in 2015 and 2016, and they "hung out" almost every day. Around that time, A.K. and the complainant were also friends with appellant's niece, M.L. A.K. first met appellant when M.L.'s mother introduced him; he was living at M.L.'s house at the time, and A.K. met him there. A.K. estimated that, in 2016, she had known appellant for about a year or two. A.K. knew that appellant had been "in jail before."

According to A.K., M.L. lived down the street from her, and when A.K. and the complainant would hang out at M.L.'s house, appellant was "always around" them. They would "hang out," appellant would talk to them, and appellant would drive the girls to places. Appellant would talk to the girls as a friend and not like an adult. M.L.'s mother was not usually at M.L.'s house, so it was mostly appellant, M.L., A.K., and the complainant that would be there.

---

6    The complainant also testified that she had a boyfriend in the fall of 2016 whom she knew from school. The complainant and her boyfriend were sexually active, and she saw her boyfriend either two days before or a day before the party at A.K.'s house. They had sex at that time, without using a condom.

A.K. noted that one time she was sitting on the couch watching television at M.L.'s house with M.L. Appellant came into the room and sat on A.K. while she was lying down. A.K. "kept telling him to get off [of her] but he wouldn't get off." Appellant then started "playing with [her] hair and . . . touching [her] hand." A.K. stated that it was "kind of weird" and it made her feel uncomfortable, but she did not want to "make a scene" so she "didn't speak up much about it." When she tried to talk to M.L. about what had happened, M.L. "kind of dismissed it."

A.K. further explained that appellant also "played around" and "wrestled" with the complainant and did things that appellant "probably shouldn't do with . . . [his] sister's kid[']s friend[]." Appellant hugged the complainant a lot and "picked her up a lot." He also made comments about the complainant's body and appearance, but A.K. could not recall what specifically appellant had said. Appellant paid more attention to the complainant than to the other girls.

A.K. testified that on October 1, 2016 there was a party at her house for her grandparents' birthdays. The party started during the day, and A.K.'s grandparents, parents, Matt, and the complainant attended the party. A.K. noted that she drank alcohol at the party, and she estimated that she had one or two cups of a mixed punch.

According to A.K., appellant was not invited to the party, but he showed up unannounced, with a dog, around 11:00 p.m. or 12:00 a.m. Appellant was looking

9

for A.K.'s father, who was asleep. Appellant was invited to stay at the party, but because he had a dog with him, A.K. and the complainant walked with appellant to M.L.'s house to drop off the dog. The complainant and appellant walked behind A.K. on the way to M.L.'s house, and they were talking. Upon arriving at M.L.'s house, A.K. and the complainant waited outside while appellant went inside to put the dog away. The three of them then walked back to A.K.'s house. When they got back, Matt, A.K., the complainant, and appellant were the only people still awake so they went to the backyard to sit by the fire pit and "hang[] out." A.K. believed that it was about 1:00 a.m.

At some point, appellant went inside to go to the bathroom. Shortly after that, the complainant went inside on her own to get a drink. Because appellant was already inside the house at that point, appellant and the complainant were in the house at the same time, while A.K. and Matt stayed outside. After about fifteen minutes, A.K. looked up at a window on the house and could see that the bathroom and the dining room were dark; there were no lights on. A.K. could not see anything or anybody inside. She thought it was odd, but she continued to stay outside. About twenty minutes later, both A.K. and Matt went inside the house and found appellant and the complainant in the kitchen. Appellant was making an egg sandwich, and the complainant was sitting in the kitchen. The complainant did not appear upset, and she was not crying at the time.

10

When appellant finished cooking, the complainant took the sandwich, and she and A.K. tried to go upstairs. But the complainant refused to go upstairs without appellant leaving the house. The complainant was "shooken up" and would not tell A.K. what was wrong. A.K. went to find Matt and asked Matt to tell appellant to leave the house. Matt did not ask A.K. any questions and just told appellant that "it was time to go." After appellant left the house, Matt could tell that something was wrong. Matt went upstairs and found the complainant "shaken up." The complainant was crying and shaking, and Matt asked the complainant if appellant "had touched her." The complainant "just cried." Although the complainant would not tell Matt was what wrong, A.K. opined that Matt "kind of assumed" and "ran outside . . . to go look for [appellant]." Around 2:00 a.m. or 3:00 a.m., A.K. went to wake up her mother, Laura.

After waking up Laura, A.K. told her that Matt had left the house, the complainant was crying, and A.K. did not know what was wrong. Laura took the complainant into A.K.'s room and talked to her for about ten or fifteen minutes. The complainant told Laura that she did not want law enforcement officers to be called.

After Laura left A.K.'s room, A.K. went inside and found the complainant still shaking and hysterically crying. The complainant told A.K. "what [had] happened." Specifically, the complainant told A.K. that appellant "went into the

bathroom" and then "asked [the complainant] to come [t]here." It was dark. The complainant went to the bathroom and appellant "closed the door." Appellant "bent [the complainant] over the sink and raped her." The complainant told A.K. that she did not want to involve law enforcement officers because she was afraid, and she did not want to mess up her relationship with A.K. or with her parents.

After sleeping for a few hours, A.K.'s father woke the girls up the next morning and told them that law enforcement officers were downstairs. The complainant spoke with law enforcement officers at A.K.'s house and then the complainant "had to go with [the officers] to get . . . a bunch of procedures . . . and tests" completed.

A.K. noted that at the time of trial she was friends with M.L., but they had gone "through some rough patches," and in October 2016, they were not friends. According to A.K., her and M.L. were not friends "for like two months and then [they were] friends again." A.K. noted that at some point before October 2016, the complainant and M.L. had "some problems" that "involve[d] some boy."

Matt testified that he is A.K.'s uncle and the brother of Laura. In October 2016, there was a party at A.K.'s home for the birthdays of Matt's parents—A.K.'s grandparents. Family members were invited to the party as well as A.K.'s friend, the complainant. Matt arrived at the party around 6:30 p.m., and later in the night, around 8:00 p.m. or 9:00 p.m., he met appellant who had stopped by A.K.'s house

12

with a dog. Appellant left A.K.'s house with the dog, but he returned around 11:00 p.m. without the dog. Matt's parents went to bed around 11:00 p.m. or 12:00 a.m., and Laura went to bed around 1:00 a.m. At that point, the only people who were awake at the house were Matt, A.K., the complainant, and appellant. According to Matt, the four of them "stayed up and hung around the []fire [in the backyard] listening to music and talking." At some point, the complainant went inside A.K.'s house. Appellant then went inside about ten minutes after that. Matt and A.K. stayed outside. Matt noticed appellant go into the bathroom. And about five to ten minutes later, Matt saw appellant and the complainant in the kitchen; appellant was making eggs. Matt estimated that appellant and the complainant were inside the house alone for about thirty minutes. According to Matt, he stayed outside the house and appellant and the complainant both came back outside. The complainant sat down beside A.K., and moments later, A.K. said, "[U]ncle Matt make him leave." Matt then told appellant, "[T]hat's the end of the evening. It's time to go [a]head and wrap it up." Appellant stood up quickly and walked through the house to the front door.

After appellant left, Matt saw the complainant sitting in a lawn chair with her knees to her chest. She was in a defensive position and covering her face like she was trying to hide her tears. A.K. kept asking the complainant what was wrong, but the complainant stayed quiet. Matt asked the complainant if appellant

13

had "touch[ed] her," and the complainant began to cry loudly. In response, Matt got mad and ran through the house and out the front door. He yelled for appellant and ran down the street in the direction of M.L.'s house. Matt expected to see appellant because it had only been two or three minutes since appellant had left A.K.'s house, but he did not see him anywhere. Matt heard Laura calling his name and yelling at him to come back to A.K.'s house. Matt went back to A.K.'s house, and Laura told him to go to bed.

The next morning when Matt woke up, Laura told him that she had called law enforcement officers and that they were on the way to the house. When law enforcement officers arrived, they spoke to "people that were involved" and the complainant went with them.

Matt noted that he did not see the complainant drinking alcohol on the night of the party. And he clarified that it was possible that the complainant went into the bathroom as well that night, but he did not see her do so.

Laura testified that A.K. is her daughter and Matt is her brother. Laura lives in a home in Katy, Harris County, Texas.[7] M.L.'s mother lives in the same neighborhood as Laura, and A.K. and M.L. were friends.[8] At some point, M.L's mother introduced Laura to appellant, M.L.'s uncle. Appellant lived at M.L.'s

---

[7] Laura gave the exact street address of her home during her testimony.

[8] Laura noted that at the time of trial, A.K. and M.L. were still friends.

14

house. At the time, appellant was using a different name than his legal name. Laura would see appellant in passing because they lived in the same neighborhood. According to Laura, when M.L.'s mother was "out," appellant would watch whatever girls were over at M.L.'s house. This included A.K. and sometimes the complainant.

As to the party at her house on October 1, 2016, Laura stated that her family was celebrating the birthdays of her parents—A.K.'s grandparents. Close friends and family members were invited to the party. The complainant, who was friends with A.K.,[9] attended the party. Both the complainant and A.K. drank two wine coolers with Laura's permission during the party. Laura noted that at some point in the night, around 7:00 p.m. or 8:00 p.m., appellant showed up at the house, although he had not been invited to the party. Laura, who was in the backyard, heard someone say that appellant was at the house, and she went to the front of the house to say hello. Laura was surprised to see appellant because he had "never really come over before" and he had not been invited to the party. Laura said hello to appellant, and when appellant began talking to Laura's husband and her brother, Laura returned to the backyard.

According to Laura, the party lasted "[l]ate into the night," and she went to bed around 1:00 a.m. or 2:00 a.m. When Laura went to bed, Matt, A.K., the

_____

[9] Laura stated that at the time of trial A.K. and the complainant were still friends, but they were not as close as they had been in 2016.

complainant, and appellant were still awake. A little while later, A.K. woke Laura up. A.K. was "really freaked out," anxious, scared, and had a sense of urgency in her voice. Based on what A.K. told her, Laura jumped out of bed and ran downstairs and out her front door to yell for Matt to come back in the house. Matt had gone after appellant and was down the street.

After Matt returned to the house, Laura tried to talk to the complainant. The complainant was scared and very upset. Her arms were crossed, and she was shaking. The complainant appeared to be under stress from what had just happened to her. The complainant told Laura that "she wanted to forget it, she didn't want to talk about it, [and] she just wanted to forget it happened." Laura asked the complainant if something had happened with appellant, but the complainant told her that she "didn't want [Laura] to call her parents" or law enforcement officers. Eventually, the complainant told Laura that appellant was in the bathroom while the complainant was in the kitchen. Appellant called the complainant over to the bathroom, and the complainant thought that appellant wanted to show her something or tell her something. When the complainant walked over to the bathroom, appellant grabbed her arm and pulled her into the bathroom. Appellant started kissing the complainant. He then pulled down her pants and had sex with her. Appellant ejaculated into the toilet. Afterward, the

16

complainant felt nauseous and "like she was going to throw up." When she knelt down over the toilet, she saw appellant's semen, and she flushed the toilet.

Camille Cole, a registered nurse at Texas Children's Hospital and a certified Sexual Assault Nurse Examiner, testified that she performed a sexual assault examination on the complainant on October 2, 2016. The complainant reported tenderness during a certain portion of the sexual assault examination, but no bleeding, tears, bruising, or swelling was observed. Cole testified that although there were no injuries to the complainant's genital and anal area, that did not "mean that nothing happened to the area" and it did not mean that a sexual assault did not occur. The complainant had two broken fingernails on her right hand, but those were the only injuries Cole saw on the complainant's body. Cole stated that it was not surprising that a fifteen-year-old female did not have injuries from a sexual assault because of the characteristics of the parts of the body at issue. Most of the patients that Cole had examined after a sexual assault did not have injuries.

As part of the sexual assault examination, Cole testified that she collected oral, vaginal, anal, fingernail, and buccal swabs from the complainant. She also collected the complainant's underwear that was worn before and after the sexual assault, and fingernail scrapings because of the complainant's broken fingernails. When Cole asked the complainant what part of appellant's body touched what part of the complainant's body, the complainant stated, "[H]is penis in my vagina."

17

The trial court admitted into evidence copies of the complainant's medical records related to her sexual assault examination. The records note that the complainant's appearance and behavior were cooperative and tearful. The records state that the complainant told Cole and a social worker at the hospital the following about the sexual assault:

> I was at my best friend[']s house . . . . He ("Chris" [H]ispanic 44 year old male) pulled me in the bathroom. He started kissing me on the mouth. I pushed him off of me but he came back at me, pulling my spandex down. He pushed me in front of the counter, he took off his belt. He raped me. It lasted about 2-3 minutes, then he was done. He did not wear a condom. He finished in the toilet. . . . He told me to stay in there. I felt like I was gonna throw up. I acted drunk but I only drank one drink with punch and alcohol in it. Then I went to sleep in my best friend[']s bed, she knew something was wrong and I told her, then she told her uncle. They called the cops. . . . He's come onto me and my best friend before[.][10]

The complainant's medical records also state that the sexual assault examination revealed that the complainant had two broken fingernails on the right hand, but no other injuries. The genital and anal examination showed no bleeding, no tears, no bruising, and no swelling. Certain areas were not visualized due to the complainant's tenderness.

In the complainant's medical records is a note from the social worker who met with the complainant at the hospital. The social worker's note states:

---

[10] Related to patient history, the medical records note: "[T]his is a 15 yr F with a sleepover at a friend's house and was sexually assaulted by a 44 yr old neighbor[] (has been in prison), vaginal/penile penetration, no condom used."

18

[The complainant] reported that last night she went to stay with a friend. They were having a party at the home that night and [the complainant] consumed some alcohol. Others were also drinking. An uncle of one of the [complainant's] former friends was at the party. This man was 44 and named Chris. Chris pulled the [complainant] into the bathroom. He kissed her on the lips and [s]tarted pulling her pants down. She pushed him away but he came back and put his penis into her vagina[]. He then "finished" in the toilet. It lasted about 3 minute[s] but seemed [v]ery long to [the complainant]. She went back upstairs to sleep with her friend who thought the [complainant] was behaving oddly and [the complainant] told her what had happened. The friend went [d]ownstairs [and] told her parents. They were not able to reach the [complainant's] mother and they called the police. The police went to the [complainant's] parents' house to ask them to bring some [c]lothes for the [complainant] and they all went . . . to the friend's house. [The complainant] and her parents came to the [hospital] for treatment.

The social worker's note also states that "[a]t some point[,] an adult at the party advised the [complainant] to be careful with [appellant]." And appellant "put his hand on the [complainant's] knee." At the end of the night, the complainant "refused to go downstairs [in the house] until she knew [that appellant] ha[d] left" the house.

Zury Phillips, a DNA analyst at the Harris County Institute of Forensic Sciences, testified that she performed DNA testing related to the complainant's case. Phillips received a known DNA sample from the complainant as well as oral, vaginal, anal, and fingernail swabs taken from the complainant. She also received

a pair of underwear that had been collected during the complainant's sexual assault examination. Finally, she received a known DNA sample from appellant.[11]

As to DNA testing results, Phillips testified that as to the vaginal swab collected from the complainant only a single-source DNA profile of a female individual could be obtained, and that DNA profile was consistent with the complainant. Appellant was excluded as a source of the DNA profile found on the vaginal swab. According to Phillips, if a male had not ejaculated inside a female's vagina, she would not expect to find any sperm DNA in a vaginal swab taken from the female individual. Other possible explanations as to why sperm DNA may not be found in the vaginal cavity would be that the female individual had urinated, she had wiped her vaginal area with toilet paper, or she had sat for a long time period.

As to the oral swab collected from the complainant, Phillips testified that only a single-source DNA profile of a female individual could be obtained, and the complainant could not be excluded as a possible source of that DNA profile. Appellant was excluded as a source from the DNA profile found on the oral swab. Phillips noted that when a swab is taken of a particular individual's mouth, she expects that individual's DNA to be found.

---

[11]    Katy Police Department ("KPD") Officer R. McQurter testified that in October 2016, he collected two buccal swabs from appellant after appellant consented to giving a DNA sample to the officer.

As to the anal swab collected from the complainant, Phillips explained that, related to the non-sperm fraction, only a single-source DNA profile of a female individual could be obtained, and the complainant could not be excluded as a possible source of the DNA profile found on the anal swab. As for the sperm fraction from the anal swab, DNA results could not be obtained.

As to the fingernail swab collected from the complainant, Phillips stated that only a single-source DNA profile of a female individual could be obtained, and the complainant could not be excluded as a possible source of that DNA profile. Appellant was excluded as a source of the DNA profile found on the fingernail swab.

Finally, as to the underwear that was collected from the complainant, Phillips testified that semen was depicted on the underwear and at least two sperm cells were confirmed using a microscope. Blood was also detected. Phillips performed DNA testing on the semen stain on the underwear, during which she sought to isolate the sperm cells from the non-sperm cells. As to the non-sperm fraction, the DNA results showed a mixture of DNA from three individuals. The complainant could not be excluded as a possible contributor to the mixture, but appellant was excluded as a contributor to the mixture. As to the sperm fraction, DNA results could not be obtained. Phillips explained, however, that because she originally detected male DNA in the semen stain, she "went further with the

21

Y-STR [test][12] to see if [she] could gain more information from the small [amount of] male DNA [that was] present." She detected two male DNA profiles, but the "levels were so low" that she could not make any comparisons or determine "who [was] who." She could not compare appellant's DNA with the two male DNA profiles obtained through the Y-STR DNA testing. The trial court admitted into evidence a copy Phillips's report.

KPD Detective J. Belton testified that he was assigned to the complainant's case in October 2016. Belton noted that the sexual assault occurred at a home in Katy, Harris County, Texas. During his investigation, Belton interviewed A.K., Laura, and Matt. The complainant participated in a forensic interview; Belton did not interview her.

Detective Belton also interviewed appellant as part of his investigation, and Belton asked appellant questions about the party on October 1, 2016. Appellant told Belton that he had arrived at A.K.'s home around 8:00 p.m. or 8:30 p.m., left to drop off his dog, and came back to A.K.'s home, staying for one and a half or two hours. According to Belton, this meant that appellant left A.K.'s home at about 10:00 p.m. or 10:30 p.m. on October 1, 2016. Appellant first told Belton that he "never went inside [A.K.'s] home" and he was only outside the home. But

---

[12] Phillips explained that Y-STR DNA testing means that she was looking only at male DNA found on the Y chromosome. Stated differently, "Y-STR is where we test[] for male DNA because we did detect small amounts of male DNA in the sample."

22

appellant changed his statement and said that he was in the living room of the home. Then he said that he cooked eggs in the kitchen for the complainant. Belton noted that the timeline that appellant provided for the night of October 1, 2016 was not consistent with what the other witnesses had told Belton.

Additionally, during the interview, appellant told Detective Belton that the complainant was lying about the sexual assault because she had "an issue with [appellant's] niece," M.L. Appellant "didn't really know why, but [the complainant] was making it up because . . . they weren't getting along or had fallen out or weren't friends anymore." Appellant also told Belton that he had sent a Facebook "friend request[]"[13] to the complainant after the night of October 1, 2016, and he sent her a "friend request[]" even though he thought that the complainant was harassing M.L.

---

[13] Facebook, Inc. is an online social media and social networking service company. In general, the Facebook service can be accessed from devices with Internet connectivity, such as personal computers, tablets[,] and smartphones. After registering, users can create a customized profile [page] revealing information about themselves. Users can post text, photos and multimedia of their own devising and share it with other users as friends[.] Users can use various embedded apps, and [they] receive notifications of their friends' activities. The Facebook account holder determines whether to allow a friend request, thus permitting the friend to access [her profile page and] account, or denying the friend request thereby blocking access to the [account holder's profile page and] Facebook account.

*McKercher v. Morrison*, No. 18cv1054 JM(BLM), 2019 WL 1098935, at *1 n.1 (S.D. Cal. Mar. 8, 2019) (order) (internal citations and quotations omitted).

The trial court admitted into evidence the videotaped recording of appellant's interview with Detective Belton. During his interview, appellant admitted that he went to A.K.'s house with a dog on October 1, 2016 around 8:00 p.m. or 8:30 p.m. Appellant acknowledged that Laura was at the home as well as A.K., the complainant, and someone's brother. Appellant took the dog back to M.L.'s house, with A.K. and the complainant accompanying him. The girls were drinking alcohol out of a cup. Appellant returned to A.K.'s house and stayed for one and a half or two hours before going back to M.L.'s house. While at A.K.'s house, appellant went to the backyard where there was a fire. Appellant talked to Matt about work. After everyone started to leave the party, appellant stayed and talked to Matt for another thirty or forty-five minutes. At some point, A.K. and the complainant went into the house, and A.K. came back out and said it was time to go to sleep. Before leaving, however, appellant cooked an egg and cheese sandwich for the complainant and went to the bathroom. Appellant estimated that it was about 10:30 p.m. or 11:00 p.m. when he left A.K.'s house.

As to the complainant, appellant stated that the complainant was A.K.'s friend and the complainant used to be friends with appellant's niece, M.L. The complainant and M.L. were no longer friends. Appellant stated that he had known the complainant for about a year, although he also stated that the complainant and

24

A.K. had been coming over to M.L.'s house since 2014—or about two years. When the complainant was at M.L.'s house, appellant babysat her.

According to appellant, while at A.K.'s house on October 1, 2016, "nothing happened" with the complainant and he was never alone with her. Appellant did not know why the complainant would be lying about having sex with appellant. Appellant stated that the complainant had always been "a question in [his] mind" and the complainant was lying because of M.L. After October 1, 2016, appellant sent the complainant a Facebook "friend request[]."

Finally, Roy Reed, a latent print examiner for the Harris County Sherriff's Department, testified that he had taken appellant's fingerprints the morning of trial, and he compared them to the fingerprints in State's Exhibit 1,[14] a copy of appellant's penitentiary packet related to his two previous convictions for the offense of aggravated sexual assault of a child in trial court cause numbers 666069 and 666070. Because the fingerprints matched, they showed that appellant was the same person who had previously been convicted twice of the offense of aggravated sexual assault of a child. The trial court's judgments in State's Exhibit 1 show that appellant pleaded guilty to two offenses of aggravated sexual assault of a child.[15]

---

[14] The trial court admitted State's Exhibit 1 into evidence.

[15] The lengths of the sentences that appellant received as a result of his convictions were redacted from the written judgments in the penitentiary packet.

The trial court also admitted into evidence State's Exhibits 2 and 3. State's Exhibit 2 is a copy of the indictment in trial court cause number 666069, which alleged that appellant, "on or about May 30, 1993, did then and there unlawfully, intentionally and knowingly cause the penetration of the female sexual organ of [A.R.] . . . , a person younger than fourteen years of age, by placing his sexual organ in the female sexual organ of [A.R.]." (Emphasis omitted.) The indictment also alleged that appellant, "on or about May 30, 1993, did then and there unlawfully[,] intentionally and knowingly cause the sexual organ of [A.R.], a person younger than fourteen years of age, to contact the sexual organ of [appellant]." (Emphasis omitted.)

State's Exhibit 3 is a copy of the indictment in trial court cause number 666070, which alleged that appellant, "on or about May 30, 1993, did then and there unlawfully, intentionally and knowingly cause the penetration of the female sexual organ of [L.F.] . . . , a person younger than fourteen years of age, by placing his finger in the female sexual organ of [L.F.]." (Emphasis omitted.)

## Sufficiency of Evidence

In his first issue, appellant argues that the evidence is insufficient to support his conviction for the offense of sexual assault of a child because the complainant's testimony was not credible, there were "a litany of problems with [the

26

complainant's] testimony and the police investigation," and there was no DNA evidence to tie appellant to the sexual assault of the complainant.

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We defer to the responsibility of the fact finder to resolve conflicts fairly in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. That said, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

We note that in reviewing the sufficiency of the evidence, a court must consider both direct and circumstantial evidence and any reasonable inferences that may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (evidence-sufficiency standard of review same for both direct and

circumstantial evidence).  Circumstantial evidence is just as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.  *See Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  For evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses inconsistent with a defendant's guilt.  *See Wise*, 364 S.W.3d at 903; *Cantu v. State*, 395 S.W.3d 202, 207–08 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd).  Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based on the cumulative force of all the evidence when considered in the light most favorable to the jury's verdict.  *Wise*, 364 S.W.3d at 903; *Hooper*, 214 S.W.3d at 13.  The jury, as the judge of the facts and credibility of the witnesses, could choose to believe or not to believe the witnesses, or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

A person commits the offense of sexual assault of a child if, regardless of whether he knows the age of the child at the time of the offense, he intentionally or knowingly causes the penetration of the sexual organ of the child by any means. *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(a).  A "[c]hild" means any person younger than seventeen years of age.  *See id.* § 22.011(c) (internal quotations omitted).

As detailed above, the complainant testified that in October 2016 she was fifteen years old. On or about October 1, 2016, while she was at the home of her friend, A.K., appellant, who was in the bathroom of the home, told the complainant to "come here." When the complainant went to the door of the bathroom, appellant grabbed her hand and pulled her inside the bathroom. He closed the door. Appellant pulled down the complainant's spandex bottoms and underwear and kissed her on the lips. When the complainant told appellant either "[s]top" or "they're going to know," appellant replied, "[S]hh, they're not going to know."

In the bathroom, appellant and the complainant moved in front of the sink, with the complainant facing the sink. Appellant was behind her. Appellant then penetrated the complainant's vagina with his penis. Appellant told the complainant, "I've been waiting so long to fuck you." Appellant stopped penetrating the complainant's vagina and ejaculated into the toilet.

The complainant's testimony, standing alone, is sufficient evidence for the jury to convict appellant of the offense of sexual assault of a child.[16] *See* TEX. CODE CRIM. PROC. ANN. art. 38.07; *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978); *Jensen v. State*, 66 S.W.3d 528, 533–34 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (testimony of complainant, even

---

[16] Appellant concedes in his briefing that the complainant "testif[ied] that she was forcibly assaulted by [appellant]" and that "others at the party testified to a contemporaneous recollection of [the complainant] so stating soon thereafter."

29

when complainant is child, standing alone, is sufficient to support conviction for sexual assault); *Lopez v. State*, 815 S.W.2d 846, 848–49 (Tex. App.—Corpus Christi–Edinburg 1991, no pet.) (holding testimony of child complainant, whose physical examination was normal after aggravated sexual assault, constituted sufficient evidence of penetration).

Moreover, to the extent that appellant's arguments focus on the credibility of the complainant's testimony or the consistency of the evidence, the jury was the sole judge of the credibility of the witnesses at trial, and we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *See Williams*, 235 S.W.3d at 750; *see also Jenkins*, 870 S.W.2d at 628.

Finally, as to appellant's complaint about a lack of DNA evidence tying appellant to the sexual assault of the complainant, neither DNA evidence nor physical evidence of trauma or abuse is required to support a sexual-assault conviction. *See Pena v. State*, 441 S.W.3d 635, 641–42 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("The absence of DNA or fingerprint evidence at trial does not render the other evidence insufficient to support the conviction."); *Bargas v. State*, 252 S.W.3d 876, 888 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.07 (complainant's testimony sufficient to support conviction).

Viewing all of the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Accordingly, we hold that the evidence is sufficient to support appellant's conviction for the offense of sexual assault of a child.

We overrule appellant's first issue.

## Admission of Evidence

In his second and third issues, appellant argues that the trial court erred in admitting extraneous offense evidence of his two prior convictions for the offense of aggravated sexual assault of a child[17] because he objected under Texas Code of Criminal Procedure article 38.37 that he did not receive proper notice and he was harmed by the trial court's admission of the evidence.[18] *See* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 3.

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Walker v. State*, 321 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd). A

---

[17] Although appellant does not specifically identify the exact extraneous offense evidence about which he complains, we assume, based on his briefing, that his complaint is that the trial court erred in admitting into evidence State's Exhibits 1–3, which relate to appellant's two prior convictions for the offense of aggravated sexual assault of a child.

[18] Appellant only argues on appeal that the trial court erred in admitting the complained-of extraneous offense evidence because the State failed to give him notice under Texas Code of Criminal Procedure article 38.37.

31

trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted). We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). This is true even if the trial court failed to give any reason or used the wrong reason for its ruling. *Prystash v. State*, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999).

During the State's case in chief, the trial court admitted into evidence State's Exhibit 1, a copy of appellant's penitentiary packet related to his two previous convictions for the offense of aggravated sexual assault of a child in trial court cause numbers 666069 and 666070. The trial court's judgments in State's Exhibit 1 show that, in 1993, appellant pleaded guilty to two offenses of aggravated sexual assault of a child, but the length of the sentences that appellant received as a result of his convictions were redacted from the written judgments in State's Exhibit 1. Reed, a latent print examiner, testified that he had taken appellant's fingerprints on the morning of trial, and he compared appellant's fingerprints to the fingerprints in State's Exhibit 1. Because the fingerprints matched, Reed explained that appellant

32

was the same person who had previously been convicted twice of the offense of aggravated sexual assault of a child.

The trial court also admitted into evidence State's Exhibits 2 and 3. State's Exhibit 2 is a copy of the indictment in trial court cause number 666069, which alleged that appellant, "on or about May 30, 1993, did then and there unlawfully, intentionally and knowingly cause the penetration of the female sexual organ of [A.R.] . . . , a person younger than fourteen years of age, by placing his sexual organ in the female sexual organ of [A.R.]." (Emphasis omitted.) The indictment also alleged that appellant, "on or about May 30, 1993, did then and there unlawfully[,] intentionally and knowingly cause the sexual organ of [A.R.], a person younger than fourteen years of age, to contact the sexual organ of [appellant]." (Emphasis omitted.)

State's Exhibit 3 is a copy of the indictment in trial court cause number 666070, which alleged that appellant, "on or about May 30, 1993, did then and there unlawfully, intentionally and knowingly cause the penetration of the female sexual organ of [L.F.] . . . , a person younger than fourteen years of age, by placing his finger in the female sexual organ of [L.F.]." (Emphasis omitted.)

"An extraneous offense is any act of misconduct, whether resulting in prosecution or not, which is not shown in the charging instrument and which was shown to have been committed by the accused." *Martinez v. State*, 190 S.W.3d

33

254, 262 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (internal quotations omitted). Generally, Texas Rule of Evidence 404(b) prohibits the admission of extraneous offenses to prove a person's character or to show that the person acted in conformity with that character. TEX. R. EVID. 404(b).

However, Texas Code of Criminal Procedure article 38.37, section 2, applicable to the prosecution of a defendant for the offense of sexual assault of a child, provides:

> Notwithstanding Rules 404 and 405, Texas Rules of Evidence, and subject to [s]ection 2-a, evidence that the defendant has committed a separate offense described by [s]ubsection (a)(1) or (2)[, including the offense of aggravated sexual assault of a child,] may be admitted in the trial of an alleged offense described by [s]ubsection (a)(1) or (2)[, including the offense of sexual assault of a child,] for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant.

TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2(b); *Belcher v. State*, 474 S.W.3d 840, 844 (Tex. App.—Tyler 2015, no pet.) (noting article 38.37, section 2(b) allows admission of evidence that defendant had previously committed certain sexual offenses against non-victims of charged offense); *see also Diaz v. State*, No. 01-18-00636-CR, 2020 WL 2026320, at *3 (Tex. App.—Houston [1st Dist.] Apr. 28, 2020, no pet.) (mem. op., not designated for publication); *Gutierrez v. State*, 585 S.W.3d 599, 612 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (article 38.37, section 2 "makes admissible evidence that the defendant ha[d] committed a

34

separate offense listed in the statute against any person 'for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant'" (quoting TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2(b)). Essentially, article 38.37 is an evidentiary rule applicable to certain types of sexual abuse cases, including those involving sexual assault of a child, that supersedes the application of Texas Rule of Evidence 404(b), and makes admissible certain extraneous offense evidence that Rule 404(b) does not. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37; *Lara v. State*, 513 S.W.3d 135, 141 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also Martines v. State*, 371 S.W.3d 232, 246 (Tex. App.—Houston [1st Dist.] 2011, no pet) (statute supersedes application of Rule 404). Under article 38.37, section 3, the State must give a defendant notice of its intent to introduce extraneous offense evidence in its case in chief not later than the thirtieth day before trial. TEX. CODE CRIM. PROC. ANN. art. 38.37, § 3; *see also Pena v. State*, 554 S.W.3d 242, 248 (Tex. App.— Houston [14th Dist.] 2018, pet. ref'd) ("Article 38.37 requires the State to give a defendant notice of the State's intention to introduce evidence of certain other offenses committed by the defendant, including sexual assault of a child, not later than the 30th day before trial.").

Appellant complains about the admission of evidence related to his two previous convictions for the offense of aggravated sexual assault of a child in trial

court cause numbers 666069 and 666070 because he did not receive timely notice.[19] The indictment for the offense charged in this case shows that one of appellant's prior convictions for the offense of aggravated sexual assault of a child is alleged in the enhancement paragraph of the April 11, 2017 indictment as a previous felony offense of which appellant was convicted on December 6, 1993.[20]

Further, on November 1, 2018, the State gave notice of its intent to use extraneous offense evidence at trial. The State included in the list of extraneous

---

[19] Due to our disposition of appellant's second and third issues, we do not address whether appellant preserved for our review his complaint that the trial court erred in admitting evidence related to his two previous convictions for the offense of aggravated sexual assault of a child. *See* TEX. R. APP. P. 47.1; *Sanders v. State*, No. 01-17-00113-CR, 2018 WL 4129895, at *4 n.3 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. ref'd) (mem. op., not designated for publication) (declining to address whether appellant preserved his complaint for appellate review); *Cruz-Escalante v. State*, 491 S.W.3d 857, 860 n.3 (Tex. App—Houston [1st Dist.] 2016, no pet.); *see also Villarreal v. State*, 470 S.W.3d 168, 174 n.2 (Tex. App.—Austin 2015, no pet.) ("As a preliminary matter, we note that it is not entirely clear that this issue was preserved for appeal because it does not appear from the record that [defendant] asked for a continuance regarding the allegedly inadequate notice [under Texas Code of Criminal Procedure article 38.37]."); *Martines v. State*, 371 S.W.3d 232, 249 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (although defendant objected to untimeliness of State's notice of intent to introduce extraneous offense evidence, his complaint trial court erred in admitting extraneous offense evidence not preserved when he did not request continuance).

[20] The indictment alleged that, before the commission of the offense on October 1, 2016, "on December 6, 1993, in Cause No. 666070, in the 184th District Court, of Harris County, Texas, [appellant] was convicted of the felony offense of aggravated sexual assault of a child." (Emphasis omitted.)

offense evidence appellant's two previous convictions for the offense of aggravated sexual assault of a child.[21]  The notice stated, in pertinent part:

> 3.   Known prior convictions which the [S]tate intends to introduce at trial:

| OFFENSE | COURT | CAUSE | COUNTY | DISPOSITION |
|---|---|---|---|---|
| Aggravated Sexual Assault of a Child-Under 14 | 184th District Court | 0666070 | Harris | 20 years TDC on 12/6/93; Mandate Affirmed on 5/24/95 |
| Aggravated Sexual Assault of a Child-Under 14 | 184th District Court | 0666069 | Harris | 20 years TDC on 12/6/93; Mandate Affirmed on 5/24/95 |

The November 1, 2018 notice also stated that the State was providing notice pursuant to Texas Rules of Evidence 404(b) and 609 and article 37.07 of the Texas Code of Criminal Procedure.[22]

On June 26, 2019, the State provided a supplemental notice of its intent to use extraneous offense evidence at trial.  The supplemental notice stated, in pertinent part:

> 4.   Pursuant to Article 38.37 of the Texas Code of Criminal Procedure, the undersigned Assistant District Attorney hereby gives notice to [appellant] and his counsel that the State intends to introduce in the case in chief, notwithstanding Rules 404 and 405 of the Texas Rules of Criminal Evidence, evidence of other

---

[21]   The November 1, 2018 notice expressly references appellant's two previous convictions for the offense of aggravated sexual assault of a child in trial court cause numbers 666069 and 666070.

[22]   Appellant filed a "Request for 37.07 Notice," a "Request for 404(b) Notice," and a "Request for Notice of Impeachment Evidence," under Texas Rule of Evidence 609, on November 16, 2018, after the State had already provided him with the November 1, 2018 notice.

crimes, wrongs, or acts committed by [appellant] against the child who is the victim of this offense for it's bearing on relevant matters, including, but not limited to, the state of mind of [appellant] and the child, and the previous and subsequent relationship between [appellant] and the child.

5. Pursuant to Article 38.37 of the Texas Code of Criminal Procedure, the undersigned Assistant District Attorney hereby gives notice to [appellant] and his counsel that the State intends to introduce in the case in chief notwithstanding Rules 404 and 405 of the Texas Rules of Criminal Evidence, evidence of other crimes, wrongs, or acts committed by [appellant] for its bearing on relevant matters, including, but not limited to, the character of [appellant] or that [appellant] acted in conformity with that character.

. . . .

7. The extraneous offense(s) and/or prior conviction(s) which the State intends to introduce at trial pursuant to 404, 609, 38.37, and 37.07 as above defined, are as follows:

That in Harris County, Texas, [appellant], on or about MAY 30, 1993, . . . did intentionally and knowingly cause the penetration of the female sexual organ of [L.F.], a person younger than fourteen years of age, by placing his finger in the female sexual organ of [L.F.].

Although the supplemental notice referenced appellant's previous conviction for the offense of aggravated sexual assault of a child in trial court cause number 666070, the State had already provided appellant notice of its intent to use this specific extraneous offense evidence in its November 1, 2018 notice—almost eight months earlier. Nineteen days after the State provided its supplemental notice, trial commenced.

38

Texas Code of Criminal Procedure article 38.37, section 3's notice requirement provides that "[t]he [S]tate shall give the defendant notice of the [S]tate's intent to introduce in the case in chief evidence described by [s]ection 1 or 2 not later than the 30th day before the date of the defendant's trial." *See* TEX. CODE OF CRIM. PROC. ANN. art. 38.37, § 3. A defendant need not request an article 38.37 notice from the State; he is automatically entitled to it. *See Villarreal v. State*, 470 S.W.3d 168, 173 (Tex. App.—Austin 2015, no pet.); *see also Lopez v. State*, No. 05-13-01137-CR, 2015 WL 3451560, at *1 n.2 (Tex. App.—Dallas Feb 2, 2015, pet. ref'd) (mem. op., not designated for publication).

On November 1, 2018, the State gave appellant notice of its intent to use extraneous offense evidence at trial. This notice was provided more than eight months before trial. In its November 1, 2018 notice, the State listed appellant's two previous convictions for the offense of aggravated sexual assault of a child as extraneous offense evidence that it sought to introduce at trial. Moreover, the State specifically stated that it "intend[ed] to introduce" these "[k]nown prior convictions" "at trial."

Appellant does not mention the State's November 1, 2018 notice in his briefing. But the failure of the November 1, 2018 notice to specifically state that the State intended to offer the extraneous offense evidence *under Texas Code of Criminal Procedure article 38.37* is inconsequential. *See Villarreal*, 470 S.W.3d

39

at 174–76 (rejecting defendant's argument that for notice to be proper under article 38.37, section 3 it "must reference not only the evidence that will be offered but must also set out the purpose for which the evidence will be introduced"); *see also Campbell v. State*, No. 02-15-00018-CR, 2015 WL 10324054, at *3 (Tex. App.— Fort Worth Dec. 10, 2015, no pet.) (mem. op., not designated for publication) (overruling defendant's complaint that State's notice of its intention to introduce extraneous offense evidence not sufficient because it did not explicitly state "that any extraneous offense or act would be introduced for character-conformity purposes" under article 38.37, section 2). Notice may be sufficient for purposes of Texas Code of Criminal Procedure article 38.37, section 3 even when it does not specifically reference "article 38.37" in the document. *See Villarreal*, 470 S.W.3d at 174–76 (although notice given to defendant months before trial did not list article 38.37, defendant was on notice of State's general intent to introduce extraneous offense evidence); *see also Campbell*, 2015 WL 10324054, at *3 (notice still proper even though State's notice did not state that it intended to introduce extraneous offense evidence under article 38.37, section 2); *Pratt v. State*, No. 2-04-424-CR, 2005 WL 3527128, at *3–4 (Tex. App.—Fort Worth Dec. 22, 2005, pet. ref'd) (mem. op., not designated for publication) (holding notice sufficient where State filed notice of intent to use "the outcry statement pursuant to art[icle] 38.072 of the Texas Code of Criminal Procedure," State filed multiple

40

notices pursuant to Texas Rule of Evidence 404(b) of its intent to offer evidence of other crimes, wrongs, or acts, and defendant "received notice of [previous] acts of sexual abuse . . . from the nine-count indictment"); *Lazalde v. State*, No. 01-02-01319-CR, 2004 WL 63968, at *2 n.3 (Tex. App.—Houston [1st Dist.] Jan. 15, 2004, pet. ref'd) (mem. op., not designated for publication).

The State's November 1, 2018 notice did not reference article 38.37, but appellant has not referred us to any authority, and we unaware of any, requiring the State to specifically list in its notice of extraneous offense evidence the statutes or rules under which that evidence will be introduced. *See Villarreal*, 470 S.W.3d at 174–76; *see also Campbell*, 2015 WL 10324054, at *3. The purpose of requiring the State to provide notice regarding its intent to use evidence of extraneous offenses is to prevent the defense from being surprised and to allow the defendant adequate time to prepare for the State's introduction of such evidence at trial. *See Villarreal*, 470 S.W.3d at 176; *see also Blunt v. State*, No. 05-19-00216-CR, 2020 WL 1672552, at *4 (Tex. App.—Dallas Apr. 6, 2020, no pet.) (mem. op., not designated for publication) (considering whether State's notice provided pursuant to article 38.37 was adequate to prevent defendant from being surprised and for him to prepare adequate defense); *Pratt*, 2005 WL 3527128, at *3 ("The purpose of the notice requirement[] in article[] . . . 38.37 is to prevent unfair surprise to the defendant and to apprise him of the extraneous offenses . . . the State plans to

introduce at trial."); *Cole v. State*, 987 S.W.2d 893, 897 (Tex. App.—Fort Worth 1998, pet. ref'd) (analyzing prior version of article 38.37, section 3 and reasoning that "[t]he purpose of the notice requirement is to prevent surprise to the defendant and apprise him of the offenses the State plans to introduce at trial"); *cf. Hayden v. State*, 66 S.W.3d 269, 271–72 (Tex. Crim. App. 2001) (discussing purpose of Texas Rule of Evidence 404(b)'s notice provision); *Hernandez v. State*, 914 S.W.2d 226, 234 (Tex. App.—Waco 1996, no pet).

More than eight months before trial began, appellant had notice of the State's intent to use evidence of his two prior convictions for the offense of aggravated sexual assault of a child. The notice indicated that the State would introduce such evidence during the guilt and innocence phase or the punishment phase of trial. *See Villarreal*, 470 S.W.3d at 176. Thus, many months before trial, appellant had notice that he needed to marshal a defense against the use of the particular extraneous offense evidence about which he now complains. *See id.*; *see also Campbell*, 2015 WL 10324054, at \*3 (record did not indicate that defendant lacked notice of, or was otherwise surprised by, any particular extraneous offense evidence introduced by State at trial). Still yet, nineteen days before trial, the State supplemented its notice to specifically reference article 38.37.[23] *See Villareal*, 470 S.W.3d at 175–76 (noting five days before trial, State amended its previous notice

---

[23] This supplemental notice did not list any new extraneous offense evidence.

42

to include specific reference to article 38.37). Texas Code of Criminal Procedure article 38.37 requires the State to give a defendant notice of the evidence that it intends to use at trial, not the specific purpose for which the State intends to offer the evidence. *See Campbell*, 2015 WL 10324054, at *3. In this case, the State, in compliance with article 38.37, provided timely notice to appellant of its intention to use at trial evidence of his two prior convictions for the offense of aggravated sexual assault of a child. *See Lazalde*, 2004 WL 63968, at *2 n.3.

Accordingly, we hold that the trial court did not err in admitting evidence of appellant's prior convictions for the offense of aggravated sexual assault of a child.[24]

We overrule appellant's second and third issues.

---

[24] Even if the trial court's admission of the complained-of extraneous offense evidence was erroneous, such error constitutes non-constitutional error that would require reversal only if the error affected appellant's substantial rights. *See Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Gutierrez v. State*, 585 S.W.3d 599, 618 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (applying harmless-error test to complaint regarding notice under Texas Code of Criminal Procedure article 38.37). Here, we would conclude that any error by the trial court was harmless. *See generally Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002) (in determining whether error affected defendant's substantial rights, considering (1) character of alleged error and how it might be considered in connection with other evidence; (2) nature of evidence supporting verdict; (3) existence and degree of additional evidence indicating guilt; and (4) whether State emphasized error).

## Conclusion

We affirm the judgment of the trial court.


Julie Countiss
Justice

Panel consists of Justices Countiss, Rivas-Molloy, and Guerra.

Publish.  TEX. R. APP. P. 47.2(b).